# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JJS, LTD., PPS INVESTORS, LTD. L.P., and JOHN SARKISIAN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0072-KSJM |
| STEELPOINT CP HOLDINGS, LLC, PRO PERFORMANCE SPORTS, LLC, JAMES CACCAVO, GARRETT POTTER, TIMOTHY BROADHEAD, TIMOTHY WISEMAN, and DOES 1 through 20, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 8, 2019
Date Decided: October 11, 2019

Stamatios Stamoulis, STAMOULIS & WEINBLATT LLC, Wilmington, Delaware; William J. Caldarelli, CALARELLI HEJMANOWSKI PAGE & LEER LLP, San Diego, California; *Counsel for Plaintiffs JJS, Ltd., PPS Investors, Ltd. L.P., and John Sarkisian*.

Matthew W. Murphy, Nicole M. Henry, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendants Pro Performance Sports, LLC, James Caccavo, Garrett Potter, Timothy Broadhead, and Timothy Wiseman*.

Bradley R. Aronstam, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Counsel for Defendant Steelpoint CP Holdings, LLC*.

**McCORMICK, V.C.**

In July 2018, the Pro Performance Sports, LLC Board of Managers approved an asset sale for $40 million in cash. Under the LLC Agreement, the company's senior preferred unitholder would receive the entirety of the sale consideration, and the common unitholders would be "out of the money." Three common unitholders commenced this litigation challenging the transaction. Their primary gripe is that the defendants breached the LLC Agreement by failing to subject the transaction to the approval of the common unitholders voting as a separate class. Alternatively, the plaintiffs seek reformation of the LLC Agreement to impose a separate class voting right. They further claim that the defendants breached their fiduciary duties in structuring and approving the transaction.

The defendants have moved to dismiss the complaint for failure to state a claim. They argue that the plaintiffs' voting rights claims falter under the plain language of the LLC Agreement, the reformation claims lack any well-pled factual support, and the fiduciary duty claims are duplicative of the contractual claims and fail for that reason. This decision concludes that the defendants' interpretation of the LLC Agreement carries the day and that the plaintiffs have not adequately pled a basis for reformation. Yet the plaintiffs have managed to sufficiently plead a claim for breach of fiduciary duty that is not foreclosed by their contractual claims. In what ultimately amounts to a pruning exercise, this decision denies the defendants' motion to dismiss as to a limited claim and grants the remainder of the motion.

## I. FACTUAL BACKGROUND

The background facts are drawn from the operative complaint (the "Complaint") and exhibits to the Complaint.[1]

### A. The Voting Rights Provisions

In 2012, Steelpoint Capital Partners, LP ("Steelpoint") expressed an interest in investing in Pro Performance Sports ("Pro Performance" or the "Company"), a company formed by Plaintiffs John Sarkisian and JJS, Ltd. to market and sell sports and fitness training products. Beginning in 2013, Steelpoint agreed to invest cash at various times in exchange for Pro Performance units. Ultimately, Steelpoint acquired Pro Performance Series A Preferred Units, Series B Preferred Units, Series C Preferred Units, and Series B Common Units. Steelpoint held these investments through affiliates.[2]

The terms of Steelpoint's initial equity investment were memorialized in a July 2013 term sheet (the "Term Sheet").[3] The parties then formalized their agreement in October 2013 by executing the Limited Liability Company Agreement

---

[1] C.A. No. 2019-0072-KSJM Docket ("Dkt.") 1, Pls. JJS, Ltd., PPS Investors, Ltd. L.P. and John Sarkisian's Compl. for Breach of Fiduciary Duty, Breach of Contract, Declaratory Relief, Breach of the Implied Covenant of Good Faith and Fair Dealing; Reformation of Contract and Action for Inspection of Company Records ("Compl.").

[2] For convenience and readability only, this decision refers to Steelpoint Capital Holdings, LLC and its affiliates that hold equity positions in the Company as "Steelpoint." Of the Steelpoint entities, only Steelpoint CP Holdings, LLC, is named as a defendant.

[3] Compl. Ex. 2.

2

of Pro Performance Sports (the "Original LLC Agreement").[4] The LLC Agreement was amended in March 2016 (resulting in the "First Amended LLC Agreement"),[5] and again in early 2017 (resulting in the "Operative LLC Agreement").[6]

Each of these agreements contain provisions governing the voting rights of classes of Pro Performance unitholders, as described below.

### 1. The Term Sheet

The Term Sheet reflects an intent to grant each class of units separate class voting rights. It provides that "[a]pproval by the holder of each class of Units, *voting*

---

[4] Compl. Ex. 3.

[5] Compl. ¶ 40. A true and correct copy of the First Amended LLC Agreement is attached to the Director Defendants' Opening Brief. Dkt. 10, Opening Br. in Supp. of Defs. Pro Performance Sports, LLC, James Caccavo, Garret Potter, Timothy Broadhead, and Timothy Wiseman's Mot. to Dismiss ("Dir. Defs.' Opening Br.") Ex. A. The First Amended LLC Agreement is quoted and thus incorporated by reference in the Complaint. *See* Compl. ¶ 40. Court may therefore consider the agreement for the purpose of the instant motion. *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995) (holding that a trial court may consider an entire document on a motion to dismiss when portion of document is quoted in complaint).

[6] Compl. Ex. 5. For completeness, note that the Original LLC Agreement was first amended in December 2013. After Steelpoint's initial investment, it was determined that "the Company's actual revenue failed to meet revenue projections" on which the Company's October 2013 valuation was based. Compl. Ex. 4 (Recitals to First Amendment to the [Original] Limited Liability Company Agreement); *id.* (Recitals to First Amendment to the Securities Purchase Agreement). The parties agreed to an after-the-fact price adjustment, which was effected through an amendment executed between the Original LLC Agreement and the First Amended LLC Agreement. Pursuant to this amendment, Steelpoint acquired additional Series A Preferred Units and new Series B Common Units; it did not amend any other provisions of the Original LLC Agreement, including the parties' respective voting rights. *See id.* ¶ 14 ("Except as provided herein to the contrary, all terms and provisions of the [Original] LLC Agreement remain in full force and effect as originally set forth.").

3

*as a separate class*, will be required" to accomplish certain member actions.[7]  The Term Sheet further provides that "[o]ther issues subject to voting rights of the Common Units shall be determined by the majority of the outstanding Common Units with the Preferred Units *voting together* with the Common Units on an as converted basis."[8]

### 2.    The Original LLC Agreement

Compared to the Term Sheet, the voting rights provision contained in Section 9.13 of the Original LLC Agreement varies in one important respect: it does not include the comparable provision calling for the various unit classes "voting as a separate class" as to certain member actions.

Instead, the Original LLC Agreement contains detailed provisions governing voting rights to be held by the various unit classes related to "Major Member Decisions."[9]  As to Major Member Decisions, Section 9.13 provides:

> The Company shall not, without the approval of the Series A Preferred Unitholder ***and the majority of the holders of the Series A Common Units and Series B Common Units*** . . . (e) authorize any action that would result in the Company making Liquidating Distributions if the Series A Preferred Unitholder would, in the aggregate, receive

---

[7] Compl. Ex. 2, at 5 (emphasis added).

[8] *Id.* (emphasis added).

[9] Compl. Ex. 3 § 9.13.

4

less than three (3) times the Series A Preferred Investment Amount . . . .[10]

This change to the parties' voting rights was made in Section 9.13 concerning Major Member Decisions only; it was not made applicable to all voting matters under the Original LLC Agreement. As to most other voting matters, a majority vote of all unitholders voting together was required;[11] as to some, the "voting as a separate class" language set forth in the Term Sheet was adopted.[12]

### 3. The First Amended LLC Agreement and the Operative LLC Agreement

Between March 2016 and early 2017, Steelpoint acquired Series B Preferred Units and Series C Preferred Units (each a newly created unit).[13] These additional

---

[10] *Id.* (emphasis added).

[11] *Id.* § 9.12 ("Voting Approval. Subject to Section 9.13, issues that are subject to the vote by the Members shall be determined by the Series A Preferred Unitholder and the holders of the Voting Common Units based *on a majority of the outstanding* Units held by such Unitholders (e.g. each such Unitholder is entitled to one vote per Unit)." (underlining in original)).

[12] *Id.* § 7.6 (Series A Preferred Unitholder, "voting as a separate class," entitled to designate "tax matters partner"); *id.* §§ 8.1.3(a)–(b) (voting rights for election of initial and first expanded Board allocated pursuant to "voting as a separate single class"); *id.* § 8.1.5 ("If a Common Unit Board Manager or Common Unit Independent Manager" steps down, "only the Voting Common Unitholders may . . . , voting separately as a class, elect a successor."); *id.* §§ 9.3.1(a)–(b) (voting rights for election of members of Board allocated pursuant to "voting as a separate class").

[13] *See* Dir. Defs.' Opening Br. Ex. A; Compl. Ex. 5 at Ex. B.

investments were memorialized in the First Amended LLC Agreement[14] and then the Operative LLC Agreement.[15]

Beyond the new classes of Preferred Units, the fundamental structure of the intervening and ultimate LLC agreements does not differ from that of the Original LLC Agreement.[16] The only change to the voting structure in each agreement is the inclusion of the holders of the newly authorized and issued equity following the "majority of the holders" phrase under Section 9.13.

Thus, Section 9.13 of the First Amended LLC Agreement provides:

> The Company shall not, without the approval of the Series A Preferred Unitholder ***and the majority of the holders of the Series B Preferred Units and the Voting Common Units*** . . . (e) authorize any action that would result in the Company making Liquidating Distributions if the Series A Preferred Unitholder would, in the aggregate, receive less than three (3) times the Series A Preferred Investment Amount . . . .[17]

And Section 9.13 of the Operative LLC Agreement provides:

> The Company shall not, without the approval of the Series A Preferred Unitholder ***and the majority of the holders of the Series B Preferred Units, the Series C Preferred Units and the Voting Common Units*** . . . (e) authorize any action that would result in the Company making Liquidating Distributions if the Series A Preferred

---

[14] *See* Dir. Defs.' Opening Br. Ex. A; *see also* Compl. ¶ 40.

[15] *See* Compl. Ex. 5 at Ex. B.

[16] *See generally* Compl. Exs. 3, 4, 5; Dir. Defs.' Opening Br. Ex. A. *See also* Dkt. 14, Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls. Ans. Br.") at 5.

[17] Dir. Defs.' Opening Br. Ex. A § 9.13 (emphasis added).

6

Unitholder would, in the aggregate, receive less than three (3) times the Series A Preferred Investment Amount . . . .[18]

## B. The Implus Transaction

In April 2018, following a failed advisor-led process, the Company received an indication of interest from Implus Footcare, LLC ("Implus"). The Pro Performance Board of Managers (the "Board") approved engaging in negotiations with Implus during an April 2018 call.

In May 2018, Implus expressed interest in pursuing a transaction in which it would purchase the inventory and most of the operating assets of Pro Performance for $40 million. Despite the efforts of the Company's financial advisor to solicit other potential bidders, Implus's $40 million offer remained the "highest bidder on the list."[19]

At a July 2018 meeting, the Board voted to proceed with the Implus transaction by a vote of four-to-two. At the time, the Board comprised: the Company's CEO, Timothy Wiseman; Steelpoint's three Board nominees, James Caccavo, Garrett Potter, and Timothy Broadhead (with Wiseman, the "Individual Defendants"); Plaintiff Sarkisian; and non-party Baron Hurdelin-Doherty (an appointee of the Series A Common Unitholders). Wiseman, Caccavo, Potter, and

---

[18] Compl. Ex. 5 § 9.13 (emphasis added).

[19] Compl. ¶ 56.

7

Broadhead voted in favor of the transaction. Sarkisian and Hurdelin-Doherty opposed.

Shortly before the Board approved the Implus transaction, the Board authorized and distributed to Wiseman a severance package of $600,000. Plaintiffs allege that this one-time severance payment was equivalent to two years of Wiseman's salary and "outside the historical norm of severance payments ever made by the Company at any time in its history."[20]

Steelpoint, as the sole Series A Preferred Unitholder, approved the Implus transaction. Joining Steelpoint were the holders of more than 55% of the combined Series B Preferred, Series C Preferred, and Voting Common Units (representing the Series A Common and Series B Common Unitholders).[21]

## C.    Plaintiffs' Inspection Demand

On November 8, 2018, Sarkisian, individually as a member of the Company's Board and on behalf of JJS, Ltd. and PPS Investors, Ltd., L.P., as unitholders of the Company, sent to Pro Performance a demand to inspect eight specific categories of

---

[20] Compl. ¶ 91.

[21] *See id.* ¶ 88; Compl. Ex. 5 at Ex. B. As provided in Exhibit B to the Operative LLC Agreement, the total units held by the Series B Preferred Unitholders, the Series C Preferred Unitholders, the Series A Common Unitholders and the Series B Common Unitholders were 263,582. *See* Compl. Ex. 5 at Ex. B. The holders of 147,356 units—representing the Series B Preferred Unitholders, Series C Preferred Unitholders, and the Series B Common Unitholders—or, 55.9% percent, voted in favor of the Implus transaction. *See id.*

documents related to the Implus transaction. Pro Performance responded through a letter from outside counsel on November 15, 2018. The November 15 response identified numerous deficiencies in the demand but stated that the Company was willing to produce certain categories of documents.

### D. This Litigation

While Pro Performance was in the process of collecting and reviewing the documents in response to Plaintiffs' books-and-records demand, Plaintiffs commenced this litigation against Steelpoint, Pro Performance, and the Individual Defendants (collectively, "Defendants").[22]

The Complaint asserts six causes of action.

- First, breach of fiduciary duties in connection with the Implus transaction;

- Second, breach of Section 9.13 of the Operative LLC Agreement;

- Third, declaratory relief that the Implus transaction required the approval of the majority of the Voting Common Units;

- Fourth, breach of the Operative LLC Agreement's implied covenant of good faith and fair dealing in connection with the structure, approval and fairness of the Implus transaction as well as the Board's response to Plaintiffs' books and records demand;

---

[22] In addition, the Complaint names fictitious defendants, DOES 1 through 20, and seeks punitive damages. Claims against fictitious ("John Doe") defendants are not permitted in this Court. *See Andreae v. Andreae*, 1992 WL 43924, at *10 (Del. Ch. Mar. 5, 1992) (granting motion to strike "references to the 'John Doe' directors"). Nor are punitive damages. *See, e.g.*, *Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1157–60 (Del. Ch. 1978). Plaintiffs conceded this at oral argument. Dkt. 24, Oral Arg. on Defs.' Mot. to Dismiss at 50:4–8. These aspects of the Complaint are dismissed.

9

- Fifth, reformation of the Operative LLC Agreement to impose the voting rights Plaintiffs seek to enforce; and

- Sixth, breach of Section 18-305 of the LLC Act and Section 7.3 of the Operative LLC Agreement concerning inspection of books and records.

Defendants moved to dismiss the Complaint on February 25, 2019, pursuant to Court of Chancery Rule 12(b)(6). The Court heard oral arguments on Defendants' motion on July 8, 2019.

## II.   LEGAL ANALYSIS

Under Rule 12(b)(6), the Court may grant a motion to dismiss for failure to state a claim if a complaint does not allege facts that, if proven, would entitle the plaintiff to relief.[23]  "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[24]  When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[25]  The reasonable conceivability standard asks whether there is a possibility of recovery.[26]  The Court,

---

[23] Ct. Ch. R. 12(b)(6).

[24] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[25] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[26] *Id.* at 537 n.13.

10

however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[27]

In applying the Rule 12(b)(6) standard, this decision first tackles Plaintiffs' core claim—that Defendants violated the Voting Common Unitholders' alleged right to a separate class vote on the Implus transaction (the Second and Third Causes of Action). This decision then turns to the remaining claims for breach of information rights (Sixth Cause of Action), breach of the implied covenant (Fourth Cause of Action), reformation (Fifth Cause of Action), and, finally, breach of fiduciary duties (First Cause of Action).

## A. Breach of Plaintiffs' Voting Rights

Plaintiffs claim that the Implus transaction was a Major Member Decision subject to Section 9.13 of the Operative LLC Agreement. They further claim that Defendants breached Section 9.13 by failing to obtain the approval of the majority of the holders of the Voting Common Units (the "common unitholders") before consummating the Implus transaction. For the purpose of their motion to dismiss, Defendants do not dispute that the Implus transaction was a Major Member Decision subject to Section 9.13.[28] Rather, they argue that Section 9.13 does not grant a separate class vote to the common unitholders on Major Member Decisions.

---

[27] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[28] *See* Dir. Defs.' Opening Br. at 3.

This decision's factual background section excerpted Section 9.13 to track the relevant amendments to its language. For the purpose of interpreting Section 9.13, the full text is useful. In full, Section 9.13 of the Operative LLC Agreement provides:

> Major Member Decisions. The Company shall not, without the approval of the Series A Preferred Unitholder and the ***majority of the holders*** of the Series B Preferred Units, the Series C Preferred Units and the Voting Common Units (with Units held by the Company or any Subsidiary not being considered to be outstanding for this purpose) (a) amend, restate or otherwise modify the Certificate, (b) amend, restate or otherwise modify this Agreement, (c) purchase, redeem or otherwise acquire any Series B Common Units, (d) declare or pay Operating Distributions (other than Tax Distributions) with respect to the Series A Preferred Units (however, item (d) will terminate if and when the Series A Preferred Unitholder no longer has the right to elect a majority of the Company's Board of Managers), (e) authorize any action that would result in the Company making Liquidating Distributions if the Series A Preferred Unitholder would, in the aggregate, receive less than three (3) times the Series A Preferred Investment Amount (however, item (e) shall terminate eight years after the Securities Purchase Effective Date).[29]

The emphasized language—"majority of the holders"—contains no inherent distributive instructions, nor is it followed by a distributive phrase. Each side seeks to impose a distributive phrase. Plaintiffs argue that Section 9.13 requires approval of Major Member Decisions by: (a) the Series A Preferred Unitholder; and (b) the

---

[29] *See* Compl. Ex. 5 § 9.13 (underlining in original) (emphasis added).

majority of the holders of *each of* the Series B Preferred Units, the Series C Preferred Units, and the Voting Common Units. Defendants argue that Section 9.13 requires that Major Member Decisions be approved by: (a) the Series A Preferred Unitholder (Steelpoint); and (b) the majority of holders of *the combined total* of the Series B Preferred Units, the Series C Preferred Units, and the Voting Common Units.

Limited liability companies are creatures of contract and are thus subject to "applicable rules of contract interpretation."[30] Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[31] In practice, the objective theory of contracts requires that a court "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[32] In so doing, the court evaluates the relevant provision's semantics, syntax, and context, aided by interpretive canons.

---

[30] *Bank of N.Y. Mellon v. Commerzbank Capital Funding Tr. II*, 65 A.3d 539, 548 (Del. 2013).

[31] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (citing *AT & T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)); *see also Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) ("A contract's construction should be that which would be understood by an objective, reasonable third party." (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

[32] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citing *Salamone*, 106 A.3d at 368).

Three contextual canons of interpretation are particularly useful in revealing the meaning of Section 9.13. The first canon in play is the whole-text canon, or the overarching principle that context is the primary determinant of meaning, and that the structure and relationship of the parts of a contract reveal the drafters' intent.[33] The second canon is the surplusage canon, which instructs that "[c]ontractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."[34] The third canon is the presumption of consistent usage, which provides that "absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract."[35]

---

[33] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913–14 (Del. 2017); *see also E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."); *id.* at 1114 (it is a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions"); *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at \*10 (Del. Ch. Sept. 11, 2015) ("Delaware courts . . . construe agreements as a whole and give meaning to all provisions.").

[34] *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008).

[35] *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at \*11 (Del. Ch. July 21, 2014) (collecting cases); *see also* 11 *Williston on Contracts* § 32:6 (4th ed. 1990) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons.").

Evaluating the whole text of Section 9.13 shows that the drafters intended to convey special rights concerning Major Member Decisions to the Series A Preferred Unitholder. In addition to language of the first clause, Section 9.13 singles out the Series A Preferred Unitholder two other times in Subsections (d) and (e). Subsection (d) provides that the Company may not "declare or pay Operating Distributions (other than Tax Distributions) with respect to the Series A Preferred Units" absent the requisite vote. Subsection (e) provides that the Company may not authorize "Liquidating Distributions if the Series A Preferred Unitholder would, in the aggregate, receive less than three (3) times the Series A Preferred Investment Amount" absent the requisite vote. Because two of the Major Member Decisions listed in Section 9.13 provide unique rights concerning the Series A Preferred Unitholder, it is sensible that the first clause be interpreted to vest the Series A Preferred Unitholder with unique class voting rights, as Defendants argue.

The surplusage canon compels the same conclusion. Under Plaintiffs' interpretation of Section 9.13, the approval of a majority of each class of Unitholders, *voting as separate classes*, is required for all Major Member Decisions.[36] But, again, the structure of the first clause of Section 9.13 singles out the Series A Preferred Unitholder, providing that "[t]he Company shall not, *without the approval of the Series A Preferred Unitholder*," do certain things. Reading

---

[36] Compl. ¶ 137; Pls.' Ans. Br. at 3–4, 15.

15

Section 9.13 to render all classes of unitholders entitled to a separate class vote would impermissibly reduce this emphasized language to "mere surplusage."[37] By contrast, reading Section 9.13 to convey class voting rights uniquely to the Series A Preferred Unitholder, as Defendants urge, gives meaning to all aspects of the provision.

The presumption of consistent usage further supports Defendants' interpretation. While the phrase "voting separately as a class" appears nowhere in Section 9.13, that phrase (or substantively identical language) appears in numerous other sections of the Operative LLC Agreement where the parties intended class-specific voting. Specifically, elsewhere, the Operative LLC Agreement provides:

- "So long as the Company is treated as a partnership for income tax purposes, the Series A Preferred Unitholder, *voting as a separate class*, shall be entitled to designate the 'tax matters partner' . . . ."[38]

- "The *Series A Preferred Unitholder, voting as a separate single class*, shall be entitled to elect four managers to the Company's Board of Managers (the "Series A Preferred Board Managers")."[39]

- "If a Common Unit Board Manager or Common Unit Independent Manager ceases to serve as a Manager before his or her term expires, only the Voting Common Unitholders may, at a special meeting of the Voting Common Unitholders or by written consent of the Unitholders *holding a majority of the outstanding Voting Common Units, voting*

---

[37] *See, e.g.*, *NAMA Hldgs.*, 948 A.2d at 419 ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court.").

[38] Compl. Ex. 5 § 7.6 (emphasis added).

[39] *Id.* § 8.1.3(a) (emphasis added).

16

> *separately as a class,* elect a successor Common Unit Board Manager or Common Unit Independent Manager, as applicable, to hold office for the unexpired term of the applicable Manager whose place is vacant."[40]

- "The holders of the Voting Common Units shall be entitled to elect two Managers of the Board of Managers, *voting as a separate class*, as set forth in Section 8.13 of this Agreement."[41]

If the parties had intended to provide class-specific voting in Section 9.13, these other provisions reflect that they knew how to do so. Because Section 9.13 varies materially from the formulation of the above provisions, the Court must presume that the parties intended a variation in meaning.

In sum, the plain language of Section 9.13 unambiguously requires that the Court adopt Defendants' interpretation. Major Member Decisions must be approved by: (a) the Series A Preferred Unitholder (Steelpoint); and (b) the majority of holders of *the combined total* of the Series B Preferred Units, the Series C Preferred Units, and the Voting Common Units. Accordingly, the Second and Third Causes of Action claiming breach of Section 9.13 and seeking a related declaration are dismissed.

---

[40] *Id.* § 8.1.5 (emphasis added).

[41] *Id.* § 9.3.1(a) (emphasis added); *see also id.* § 8.1.4 ("The Series B Preferred Board Manager may only be removed by the affirmative vote of the Unitholders holding *a majority of the Series B Preferred Units*." (emphasis added)).

## B. Breach of Information Rights

Plaintiffs seek to inspect books and records under Section 18-305 of the LLC Act and Section 7.13 of the Operative LLC Agreement to investigate matters at issue in this litigation—i.e., "to determine whether the Implus transaction as approved by the Company improperly and without the required vote of members and approval of the minority owners as set forth in Section 9.13 of the Operating Agreement."[42] Under Delaware law, there are limited circumstances where an equity holder may enforce inspection rights after commencing litigation concerning the subject matter of the inspection demand.[43] Those special circumstances include when defendants' delay in responding to an inspection demand risks prejudicing a plaintiff whose claims may become time-barred while it waits for the response,[44] or when the plenary complaint has been dismissed without prejudice and with leave to amend.[45]

Plaintiffs have not identified any of the special circumstances that would permit Plaintiffs to enforce their inspection demand at this stage. By filing a plenary action without first resolving issues relating to a demand to inspect books and

---

[42] Compl. ¶ 112.

[43] *See CHC Invs. LLC v. FirstSun Capital Bancorp.*, 2019 WL 328414, at *3–5 (Del. Ch. Jan. 24, 2019).

[44] *See, e.g.*, *Romero v. Career Educ. Corp.*, 2005 WL 3112001, at *2 (Del. Ch. Nov. 4, 2005); *Khanna v. Covad Commc'ns Gp., Inc.*, 2004 WL 187274, at *3 (Del. Ch. Jan. 23, 2004); *In re UnitedHealth Gp., Inc.*, C.A. No. 2017-0681-TMR (Del. Ch. Sept. 17, 2019) (TRANSCRIPT).

[45] *See, e.g.*, *King v. Verifone*, 12 A.3d 1140, 1150 (Del. 2011).

records, Plaintiffs have conceded that the documents they sought to inspect were no longer necessary to investigate alleged wrongdoing by the Company or its Board of Managers.[46] Accordingly, Plaintiffs lack a proper purpose sufficient to maintain their books-and-records action. Thus, the Sixth Cause of Action is dismissed.

## C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs claim that Defendants breached the Operative LLC Agreement's implied covenant of good faith and fair dealing by conducting the Implus transaction in a manner unfair to Plaintiffs and failing to comply with Plaintiffs' books and records request. Under Delaware law, "[t]he implied covenant is inherent in all contracts."[47] Yet Delaware courts have characterized the implied covenant as "a limited and extraordinary legal remedy"[48] whose application is a "cautious enterprise."[49] "[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the

---

[46] *See, e.g.*, *Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 194634, at *11 (Del. Ch. Jan. 15, 2019) ("Delaware courts have recognized that a stockholder who files a plenary action asserting claims of mismanagement undercuts his alleged need to obtain documents under Section 220 to investigate the same alleged acts of mismanagement."); *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *6 (Del. Ch. Aug. 30, 2016) ("By filing the Plenary Action, [plaintiff] effectively conceded that the books and records he seeks are not necessary or essential to his stated purpose of investigating mismanagement or wrongdoing.").

[47] *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2016).

[48] *Oxbow Carbon & Minerals Hldgs. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2010) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)).

[49] *Nemec*, 991 A.2d at 1125.

19

matter at hand."[50]  When a contract is silent, the implied covenant can be employed "to analyze unanticipated developments or to fill gaps in the contract's provisions."[51] "Even where the contract is silent, '[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[52]  The implied covenant "should not be applied to give plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.'"[53]

Instead, the implied covenant "seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[54]  It applies when a contract is silent and "a party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[55]

---

[50] *Oxbow*, 202 A.3d at 507 (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015), then quoting *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 9210 A.2d 1020, 1033 (Del. Ch. 2006)).

[51] *Id.* at 506–07 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

[52] *Id.* at 507 (quoting *Nationwide*, 112 A.3d at 896)

[53] *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636–37 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)).

[54] *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 184 (Del. Ch. 2014).

[55] *Dieckman*, 155 A.3d at 367.

It is particularly "well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[56] "When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal."[57]

Plaintiffs have failed to identify any gap in the Operative LLC Agreement. Plaintiffs plead each allegedly wrongful act as a breach of specific provisions of the Operative LLC Agreement. Section 9.13 governs their voting rights claim; Section 8.5(a) addresses the standard by which the sales process is evaluated; and Section 7.3 governs the books and records requests. Thus, because the Operative LLC Agreement sets contractual standards by which to evaluate Defendants' conduct, the implied covenant of good faith and fair dealing is inapplicable to this dispute.[58] The Fourth Cause of Action is dismissed.

---

[56] *Id.* at 361.

[57] *Nemec*, 991 A.2d at 1125–26 (citing *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del. Ch. 2000)); *see also Dieckman*, 155 A.3d at 367.

[58] *See Nemec*, 991 A.2d at 1127 ("The implied covenant will not infer language that contradicts a clear exercise of an express contractual right.").

## D.    Reformation of the LLC Agreement

Plaintiffs ask the Court to reform Section 9.13 of the Operative LLC Agreement on the basis of fraud or mistake.  Plaintiffs do not argue that they were defrauded during the drafting of the Operative LLC Agreement or that there was a mutual mistake between the parties.[59]  Thus, their claim hinges on the theory of unilateral mistake.

"[R]eformation based on unilateral mistake is available where a party can 'show that it was mistaken and that the other party knew of the mistake but remained silent.'"[60]  The party seeking reformation must have the "ability to show, by clear and convincing evidence, that despite the written agreement one party maintains is accurate, that existing writing erroneously expresses the parties' true agreement."[61] "Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand."[62]  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[63]

---

[59] *See* Compl. ¶¶ 149–151.  *See generally* Pls.' Ans. Br. at 43–46.

[60] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 680 (Del. 2013) (quoting *Cerberus Intern., Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002)).

[61] *Id.*

[62] *Hob Tea Room v. Miller*, 89 A.2d 851, 857 (Del. 1952).

[63] Ct. Ch. R. 9(b).

"Rule 9(b) requires the pleading to inform the opposing party of the precise transaction at issue and the fraud or mistake alleged to have occurred in the transaction so as to notify the opposing party of its precise alleged misconduct."[64]

Except to identify the inconsistent voting provision between the Term Sheet and the Original LLC Agreement, Plaintiffs have not identified particularized facts sufficient to show that they were mistaken or that their counterparties took advantage of such a mistake.[65]

The Term Sheet does not support Plaintiffs' claim of unilateral mistake. On this point, *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC* is instructive.[66] In that case, the plaintiffs sought reformation on the grounds of unilateral mistake when an amendment to the contract did not adhere exactly to a previously agreed-upon memorandum of understanding summarizing the amendment.[67] In rejecting the plaintiffs' reformation claim, this Court identified three weaknesses in the plaintiff's argument: (1) the memorandum of understanding was non-binding; (2) the amendment was one page in length, so a party's "careful

---

[64] *James River-Pennington Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *9 (Mar. 6, 1995).

[65] *See generally* Dkt. 24 at 49:10–20 (Plaintiffs' counsel conceding that the existence of the Term Sheet is the only particularized allegation pled in support of the reformation claim).

[66] 2009 WL 3247992 (Del. Ch. Oct. 6, 2009).

[67] *Id.* at *2–3.

reading" would have quickly informed the party of any changes; and (3) it was not apparent to the defendants that the terms of the amendment, even though slightly different from the memorandum of understanding, were unacceptable to the plaintiff.[68]

The same three infirmities are present in Plaintiffs' argument: (1) The Term Sheet is non-binding.[69] (2) The clause at issue is significantly less than one page, and even a glancing review of Section 9.13 would have put Plaintiffs on notice that its language was different from that of the Term Sheet.[70] (3) It is not apparent that Section 9.13 would have been unacceptable to Plaintiffs. The Court has already found that the plain language of the clause was unambiguous, and Defendants were "entitled to expect that [Plaintiffs] would read the [agreement] with care."[71] The fact that Plaintiffs had the opportunity to but did not oppose the various modifications to the LLC Agreements, standing alone, undercuts the argument that their counterparties knew Plaintiffs were mistaken.[72]

---

[68] *Id.* at *5.

[69] Compl. Ex. 2 at 9 ("This term sheet, executed by and between the Parties . . . represents an understanding in principle only.").

[70] *Id.*

[71] *West Willow*, 2009 WL 3247992, at *5.

[72] *See In re 11 West P'rs, LLC*, 2019 WL 1300859, at *6 (Del. Ch. Mar. 20, 2019); *see also BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *6 (Del. Ch. Aug. 3, 2004) (summarizing that "a claim for reformation based on mistake must be based on something more than a conclusory allegation of a mutual understanding and agreement on the issue"); *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *15 (Del.

Thus, Plaintiffs have failed to plead a sufficient factual foundation for this court to reform the Operative LLC Agreement. The Fifth Cause of Action is dismissed.

### E.    Breach of Fiduciary Duties

Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs by approving the sale of substantially all of Pro Performance's assets to Implus. By default, managers of limited liability companies owe fiduciary duties akin to those of directors of a corporation.[73] Although Delaware law permits a limited liability company to eliminate fiduciary duties in its governing agreements,[74] the Operative LLC Agreement does not do so. Rather, the Operative LLC Agreement provides, subject to certain exceptions not at issue in this case, that: "The Board of Managers and Officers of the Company shall act at all times in good faith, in accordance with

---

Ch. July 6, 2004) (explaining that reformation "must be applied narrowly so as to ensure contracting parties that in only limited circumstances will the court look beyond the four corners of a negotiated contract . . . especially where the [contract] is an integrated document").

[73] 6 *Del. C.* § 18-1104; H.R. 126, 147th Gen. Assemb. Reg. Sess. (Del. 2013) ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties . . . shall govern." (underlining in original)).

[74] 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement.").

25

fiduciary duties owed to stockholders of a corporation under Delaware General Corporation Law and interpretive Delaware case law."[75]

In moving to dismiss this claim, Defendants argue that the fiduciary duty claims are a mere repackaging of the facts underlying the breach of contract claims.[76] But Plaintiffs are not precluded from asserting claims for breach of fiduciary duty based on a "common nucleus of operative facts" as a breach of contract claim if the breach of fiduciary duty claims "depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy."[77]

In an effort to cast their breach of fiduciary duty claims as dependent on additional facts and broader in scope, Plaintiffs point to eight specific allegations.[78] But Defendants argue that of the eight factual allegations, six actually do repackage

---

[75] Compl. Ex. 5 § 8.5(a).

[76] *See* Dkt. 16, Reply Br. in Further Supp. of Defs. Pro Performance Sports, LLC, James Caccavo, Garrett Potter, Timothy Broadhead, and Timothy Wiseman's Mot. to Dismiss ("Dir. Defs.' Reply Br.") at 20–21 (citing *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *8 (Del. Ch. May 10, 2018)).

[77] *Schuss v. Penfield, P'rs, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008); *see also Nemec*, 991 A.2d at 1129 ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." (citing *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833 (Del. Ch. 2006); *Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998))).

[78] Pls.' Ans. Br. at 31.

Plaintiffs' claim under Section 9.13,[79] and one restates Plaintiffs' claim for inspection of books and records.[80] For the sake of analysis, the Court assumes that Defendants are correct and that those allegations do not suffice to support a claim for breach of fiduciary duty.[81]

After trimming the fat, only one of Plaintiffs' eight identified factual allegations remains—that the Implus transaction was approved only because the

---

[79] *See id.* at 28–30 ("[1] Structuring the liquidating transaction with Implus as an asset sale, not an equity sale, and asserting that such a transaction therefore could be approved by the Board without a vote of the unitholders for approval after acknowledging the applicability of the common unitholders' "blocking rights" under Section 9.13. [2] Not providing notice of the July 31, 2018 vote to sell the Company's assets to Implus until just a few days before the vote was held, despite having earlier promised to keep the common unitholders apprised of the status and terms of any potential deal with Implus. [3] Depriving the Board representatives of Plaintiffs the written materials for the Implus transaction until almost immediately before the commencement of the July 31, 2018 Board meeting to vote on the transaction, announcing at the meeting that a full and final deal had already been negotiated with Implus without the input of Plaintiffs, and allowing only an hour for discussion of the major transaction. [4] Purporting to adopt the Implus transaction without the required approval of a majority of the Voting Common Units, and then proceeding to close and act upon the deal over their objections. . . . [7] Acting in their own self-interest and in the interest of the controlling unitholder by selling the assets of the Company to Implus, to the detriment of Plaintiffs and the other minority unitholders, resulting in monetary distributions to Defendants and their affiliates and nothing to Plaintiffs and the other minority owners. [8] Proceeding with a sale of the Company's assets to Implus that was unfair to the minority owners despite the fact that the transaction was not approved by a majority of independent and disinterested members of the Board of Managers, and depriving Plaintiffs and the other minority owners of the opportunity to see if the Company would produce profits for them if it was instead continued to be operated.") (internal citations omitted).

[80] *See id.* ("[6] Failing to provide Plaintiffs with documents concerning the Implus transaction and the voting approval requirements in response to Plaintiffs' written demands under both the Operating Agreement and Delaware statutory law for over 80 days after Plaintiffs served their inspection demand.").

[81] *See MHS Capital*, 2018 WL 2149718, at *8.

Board granted director Tim Wiseman, the swing vote, an outsize severance package of $600,000 that was authorized and distributed immediately prior to the vote.[82] The question is thus whether this allegation supports a claim for breach of fiduciary duty. On this point, the Court confronts "the gating question that frequently dictates the pleadings stage disposition of a breach of fiduciary duty claim: under what standard of review will the court adjudicate the claim?"[83]

Defendants contend that the appropriate standard of review is the business judgment rule. The business judgment rule "posits a powerful presumption in favor of actions taken by directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be attributed to any rational business purpose."[84] "If the business judgment rule attaches to protect corporate officers and directors and the decisions they make, our courts will not second-guess these business judgments."[85]

One way to rebut the presumption of the business judgment rule is to discredit the notion that "action was taken by a board majority comprised of disinterested and

---

[82] Compl. ¶ 91.

[83] *Tornetta v. Musk*, 2019 WL 4566943, at *1 (Del. Ch. Sept. 20, 2019).

[84] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 346, 361 (Del. 1993) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[85] *Id.* (citing *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989); *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014).

independent directors."[86]  If a plaintiff is successful in rebutting this presumption, the burden shifts to Defendants to prove the entire fairness of the transaction.[87] Entire fairness "is the highest standard of review in corporate law."[88]  "The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6)."[89]

In this case, Plaintiffs assert that entire fairness is the appropriate standard of review because a majority of the managers that approved the Implus transaction was interested or lacked independence.  At the time of the transaction, the Board comprised Wiseman, Caccavo, Potter, Broadhead, Sarkisian, and Hurdelin-Doherty. Sarkisian, a plaintiff in this case, and Hurdelin-Doherty, also appointed by common unitholders, voted against the transaction.  The analysis thus turns on whether Plaintiffs have adequately alleged conflicts as to Wiseman, Caccavo, Potter, and Broadhead.

A "director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders' or

---

[86] *In re Crimson*, 2014 WL 5449419, at *9.

[87] *Id.*

[88] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

[89] *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018); *see also Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *15 (Del. Ch. July 26, 2018) (noting entire fairness review "typically precludes dismissal of a complaint under Rule 12(b)(6)").

29

if 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.'"[90] The personal financial benefit must be of "sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the [company] shareholders without being influenced by her overriding personal interest."[91] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[92] "[I]n circumstances where the interests of the common stockholders diverge from those of the preferred stockholders, it is possible that a director could breach her duty by improperly favoring the interests of the preferred stockholders over those of the common stockholders."[93]

It is reasonably conceivable that Wiseman was interested in the transaction. Plaintiffs allege that his one-time severance payment was equivalent to two years of Wiseman's salary and "outside the historical norm of severance payments ever made by the Company at any time in its history."[94] Plaintiffs have not directly alleged

---

[90] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[91] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999).

[92] *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984).

[93] *Trados*, 2009 WL 2225958, at *7.

[94] Compl. ¶ 91. The allegations concerning Wiseman's severance payment are sufficiently pled and not conclusory. *See In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *2 (Del.

materiality, but at the pleadings stage, they are entitled to the inference that a severance payment equivalent to two years of an officer's salary would be sufficiently material.[95]

It is also reasonably conceivable that Caccavo, Potter, and Broadhead lacked independence from Steelpoint. Plaintiffs plead that each of Caccavo, Potter, and Broadhead is "an owner, officer, and/or employee of one or more of the Steelpoint entities" and that each was appointed to the board by Steelpoint.[96] Although it is not enough to plead only that a venture capital fund appointed a director, an allegation of an "ownership or employment relationship with an entity that owns . . . preferred stock . . . is sufficient, under the plaintiff-friendly pleading standard on a motion to dismiss."[97]

It is additionally reasonably conceivable that Steelpoint was conflicted with respect to the transaction. A "VC firm's ability to receive their liquidation preference could give the VC directors a divergent interest in the Merger that

---

Ch. Oct. 17, 2017) (explaining that conclusory allegations are those that "state a generalized conclusion with no supporting facts").

[95] *See Chen v. Howard-Anderson*, 87 A.3d 648, 670 (Del. Ch. 2014) (finding a director interested in a merger transaction at the pleading stage when he received $272,803 cash severance package (citing *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006); *In re Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002))).

[96] Compl. ¶¶ 10–12.

[97] *Trados*, 2009 WL 2225958, at *8.

conflicted with the interests of the common stock."[98] Although at trial Plaintiffs would be required to show an actual conflict of interest between Steelpoint and the common unitholders, at the pleadings stage, it is "reasonable to infer . . . that the interests of the preferred and common stockholders were not aligned with respect to the decision to pursue a transaction that would trigger the liquidation preference of the preferred and result in no consideration for the common stockholders."[99]

Because it is reasonably conceivable that Caccavo, Potter, and Broadhead lacked independence from Steelpoint, and that Steelpoint and the common unitholders' interests conflicted with respect to the Implus transaction, it is reasonably conceivable that Caccavo, Potter, and Broadhead were laboring under actual conflicts of interest. Coupled with the allegations supporting Wiseman's interest in the transaction, it is reasonably conceivable that entire fairness is the proper standard of review. At this stage, Defendants have not argued that the transaction was entirely fair, so their motion to dismiss Count One must be denied.

## III. CONCLUSION

Defendants' motion to dismiss is GRANTED in part and DENIED in part. Counts Two, Three, Four, Five, and Six are dismissed for failure to state a claim

---

[98] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 47 (Del. Ch. 2013).

[99] *Trados*, 2009 WL 2225958, at *7.

under Rule 12(b)(6).  Plaintiffs have stated a claim for breach of fiduciary duty with respect to Count One.